## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**TCA LOGISTICS, LLC**
3909 Hampton Oaks Parkway, Suite D
Tampa, FL 33610

    Plaintiff,

v.

**MARY E. MCCOY**
968 Arnet Avenue
Union, NJ 07083

    Defendant.

Civil Action No.

JUDGE

MAGISTRATE JUDGE

**JURY TRIAL DEMAND**

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff TCA Logistics, LLC ("TCA" or "Plaintiff"), by and through its undersigned attorneys, hereby alleges as follows for its Complaint against Defendant Mary E. McCoy ("McCoy"):

## NATURE OF THE ACTION

1.    This action is the result of McCoy's breach of her employment agreement; misappropriation, disclosure, and unauthorized use of TCA's confidential information; violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1833, *et seq.*; violation of the New Jersey Trade Secrets Act, N.J.S.A. 56:15-1, *et seq.*; and unfair competition with TCA.

2.    TCA is a last mile logistics company that operates a network of warehouses and cross docks along the East Coast. McCoy was one of two Regional Directors at TCA. In this role, McCoy managed day-to-day logistics and operations of thirteen dedicated locations. She was also responsible for managing customer relationships and had direct daily interaction with multiple key employees of TCA's customers.

3.    As part of her employment McCoy received TCA's confidential information, including but not limited to customer and client lists and information and rates and pay scales for TCA's last mile logistics.  To protect its confidential information, TCA and McCoy entered into an employment agreement.

4.    Under the employment agreement, McCoy was prohibited from (a) disclosing TCA's confidential information to anyone outside of TCA; (b) retaining TCA's confidential information upon her termination of employment; (c) accepting employment with any competitor of TCA who provides last mile delivery for a period of twelve (12) months; (d) soliciting or hiring any TCA employees or independent contractors who had worked for TCA in the six (6) months before McCoy's termination for a period of twenty-four (24) months; and (e) soliciting or inducing any TCA customer, client, vendor, supplier, or contractor to terminate its relationship with TCA for a period of twenty-four (24) months.

5.    After five years of working at TCA, McCoy resigned on January 3, 2025 to work for its direct competitor, Diakon Logistics ("Diakon).

6.    McCoy's role at Diakon, TCA's direct competitor, violates the non-competition provision contained in her TCA employment agreement, as McCoy is engaged in employment with a competitor of TCA who provides last mile delivery.

7.    Moreover and based upon information and belief, McCoy is now disclosing and using TCA's confidential information to generate sales for Diakon's pecuniary gain, causing TCA significant irreparable harm and monetary damages.  McCoy's employment at Diakon also violates the non-solicitation provisions contained in her TCA employment agreement.

8.    Despite TCA's demands on McCoy to cease and desist her employment at Diakon, McCoy has refused to do so.  As a result, TCA now brings suit against McCoy.

## **THE PARTIES**

9.    Plaintiff TCA Logistics, LLC is a limited liability company incorporated in New York, with its principal place of business in Tampa, Florida.

10.    Defendant Mary E. McCoy is a New Jersey citizen who resides at 968 Arnet Ave, Union, NJ 07083-7602.  McCoy worked for TCA from June 17, 2019 until she voluntarily left on January 3, 2025 to work for Diakon, TCA's direct competitor.

## **JURISDICTION AND VENUE**

11.    This Court has subject matter jurisdiction over this dispute, pursuant to 28 U.S.C. § 1331, because TCA's claims against McCoy under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1833, *et seq.*, raise a Federal question.  TCA's additional claims fall within the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, because the claims are so related to the Federal question that they form part of the same case or controversy.

12.    The Court has personal jurisdiction over McCoy pursuant to the venue provision in her Employment Agreement with TCA, which states in pertinent part:

> This Agreement shall be governed by and construed and enforced in accordance with the internal laws (as opposed to the conflicts of laws provisions) of the State of New Jersey. In the event of any suit, action or proceeding relating in any way to this Agreement and/or the Employee's employment with the Company, such suit, action or proceeding shall be brought in the state or federal courts located in New Jersey.

A true and accurate copy of McCoy's Employment Agreement is attached hereto as **Exhibit 1**. (*See* Ex. 1, § 5.6.)

13.    This Court also has personal jurisdiction over McCoy because McCoy breached her Employment Agreement and committed a tortious act within the District of New Jersey, and purposefully caused tortious injury within the District of New Jersey.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claims in this Complaint occurred in this District and, as discussed above, McCoy is subject to the Court's personal jurisdiction in this District.

## FACTUAL BACKGROUND

15.    TCA is a last mile logistics company.

16.    Last mile delivery represents a small, niche sector of the broader transportation and logistics market.  TCA's last mile delivery entails the movement of big-and-bulky, non-conveyable products, including mattresses, appliances, furniture, and fitness equipment, from warehouses and customer distribution centers to consumers.  Notably, last mile delivery is the most expensive, complicated, and time-consuming part of the shipment process and requires direct interface with end-customers and consignees.

17.    TCA provides dedicated last mile services at eighteen customer-operated distribution centers located throughout twelve states, including California, Florida, Georgia, Illinois, Maryland, Massachusetts, New York, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, and Virginia.

18.    TCA employs personnel to oversee and direct its logistics operations and manage relationships with its customers.  TCA prides itself in maintaining and expanding relationships with existing customers and strategic partners, attracting and developing new customers, and developing future customer opportunities and strategic partnerships.

19.    TCA expends considerable time, money, and effort to develop and maintain its logistics operations, customer relationships, sales and marketing strategies, pricing strategies, business development plans, and corporate goodwill to grow its business and provide its last mile delivery services to its customers.

Docusign Envelope ID: 1C0B913D-6DEF-4305-85CF-96C082107803

20.     As a result of TCA's efforts, many customers have been TCA customers for multiple years and were reasonably expected to continue as TCA customers into the future.

**A.      TCA Hires McCoy and Promotes her to Director of Operations.**

21.     On or about June 17, 2019, TCA hired McCoy as an Operations Manager. McCoy was promoted throughout her TCA employment and reached the level of Regional Director.

22.     From June 17, 2019 through April 30, 2024, McCoy was an at-will employee of TCA.

23.     On April 30, 2024, the owner of TCA, Thomas Eletto, sold TCA to Diverse Logistics Holdings.  During acquisition negotiations and the due diligence phase, McCoy was identified as a key employee given her access to customer relationships and TCA confidential information.

24.     Following the acquisition, TCA promoted McCoy to Regional Director, one of two Regional Director positions at TCA.

25.     McCoy's promotion was coupled with a salary increase, eligibility for a new bonus program, and four weeks of vacation.

26.     Upon information and belief, McCoy was also granted a participation right in a phantom stock plan offered by the prior owner of TCA related to his equity interests in Diverse, the holding company for TCA, during the closing of the acquisition.  As such, McCoy was to receive additional consideration upon the consummation of the acquisition, and did receive additional consideration.

27.     In exchange for a salary increase, eligibility for a new bonus program, four weeks of vacation, and promotion to Regional Director, McCoy agreed to enter into an Employment Agreement with TCA on April 30, 2024. (*See* Ex. 1.)

28.     As Regional Director, McCoy had daily access to TCA's confidential and proprietary business information, including, but not limited to, daily operations, last mile logistics and routes, pay scales and rates, marketing techniques, trade secret information, accounts, customer information, contracts or agreements, data, records, financial information, software, customer lists, prospective customer leads or lists, product information, strategic business plans, business methodology and processes, and costs and pricing policies ("TCA Confidential Information")

29.     McCoy also had daily contact with TCA's vendors and contractors.  She participated in the recruiting and hiring of contractors who worked at TCA's warehouses and customer operated distribution centers.

30.     TCA took steps to protect TCA Confidential Information by requiring McCoy to sign the Employment Agreement, which contained a confidentiality provision as well as non-competition and non-solicitation restrictive covenants.  The Employment Agreement provides, in pertinent part:

**Section 4.1.    Unauthorized Disclosure**

The Employee agrees and understands that in the Employee's position with the Company, the Employee has been and will be exposed to and has and will receive information relating to the confidential affairs of the Company and its direct and indirect subsidiaries and affiliates (the "Company Group"), including, without limitation, technical information, intellectual property, business and marketing plans, strategies, customer information, software, other information concerning the products, promotions, development, financing, expansion plans, business policies and practices of the Company Group and other forms of information considered by the Company Group to be confidential or in the nature of trade secrets (including, without limitation, ideas, research and development, know-how, formulas, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information and business and marketing plans and proposals) (collectively, the "Confidential Information"). Confidential Information shall not include information that is generally known to the public or within the relevant trade or industry other than due to the Employee's violation of this Section 4.1 or disclosure by a third party

who is known by the Employee to owe the Company an obligation of confidentiality with respect to such information. The Employee agrees that **at all times during the Employee's employment with the Company and thereafter, the Employee shall not disclose such Confidential Information, either directly or indirectly, to any individual, corporation, partnership, limited liability company, association, trust or other entity or organization,** including a government or political subdivision or an agency or instrumentality thereof (each a "Person") **without the prior written consent of the Company and shall not use or attempt to use any such information in any manner other than in connection with his employment with the Company,** unless required by law to disclose such information. This confidentiality covenant has no temporal, geographical or territorial restriction. Upon termination of the Employee's employment with the Company, the Employee shall promptly supply to the Company all property, keys, notes, memoranda, writings, lists, files, reports, customer lists, correspondence, tapes, disks, cards, surveys, maps, logs, machines, technical data and any other tangible product or document which has been produced by, received by or otherwise submitted to the Employee during or prior to the Employee's employment with the Company, and any copies thereof in his possession. Notwithstanding anything herein to the contrary, if the Employee is legally required to disclose any Confidential Information, he shall, to the extent permitted by applicable law, promptly notify the Company to permit the Company to seek a protective order or take other appropriate action. If, in the absence of a protective order, the Employee is compelled as a matter of law to disclose Confidential Information to a third party, such party and such party's representatives may disclose to the third-party compelling disclosure only the part of such Confidential Information as is required by law to be disclosed.

(Ex. 1, § 4.1 (emphasis added).)

31.    Accordingly. McCoy agreed, pursuant to Section 4.1 of the Employment Agreement, to a) not disclose TCA Confidential Information to anyone not authorized to receive or use it, b) only use TCA Confidential Information on behalf of TCA, and c) return all TCA Confidential Information to TCA when her TCA employment ended.

32.    The Employee Agreement also barred McCoy from directly competing with TCA for twelve months following her resignation from TCA:

**Section 4.3.    Non-Competition**

By and in consideration of the Company entering into this Agreement, and in further consideration of the Employee's exposure to the Confidential Information of the Company Group, the Employee agrees that the Employee shall not, during the Employee's employment with the Company (whether during the Initial or any Renewal Term) and **for twelve (12) months** following the Employee's Termination Date (the "Restriction Period"), no matter what the reason for such termination, directly or indirectly, in the United States, **be engaged by, as an employee**, consultant, independent contractor, owner, board member, partner, or investor in, **any Restricted Enterprise (as defined below) to perform the activities, duties, and/or responsibilities that the Employee performed or oversaw during the Employee's employment with the Company**; provided, that in no event shall ownership of two percent (2%) or less of the outstanding securities of any class of any issuer whose securities are registered under the Securities Exchange Act of 1934, as amended, including mutual funds, standing alone, be prohibited by this Section 4.3, so long as the Employee does not have, or exercise, any rights to manage or operate the business of such issuer other than rights as a stockholder thereof. For purposes of this paragraph, **"Restricted Enterprise" shall mean any Person that is actively engaged in competition with the business of the Company or any member of the Company Group in the provision of or arranging for "last mile" home delivery, warehousing and distribution services of non-conveyable goods, including fitness equipment, mattresses, appliances, furniture and other household goods.** The Employee agrees that the foregoing restrictions are reasonable both as to time and geographical extent given the nature and scope of the business of the Company and the Employee's role with the Company. During the Restriction Period, upon request of the Company, the Employee shall notify the Company of the Employee's then-current employment status.

(Ex. 1, § 4.3 (emphasis added).)

33.     The Employee Agreement further barred McCoy from interfering with TCA's relationships with customers, customers, vendors, and other business partners. Specifically, the Employment Agreement contained a twenty-four month prohibition on soliciting TCA customers and customers, pursuant to the following:

**Section 4.5     Interference with Business Relationships.**

During the Term and for **twenty-four (24) months following the Employee's Termination Date** (other than in connection with carrying out his responsibilities for the Company Group), the Employee **shall not directly or indirectly induce or solicit (or assist any Person to induce or solicit) any customer, client, vendor, supplier, independent contract [sic]**

or other business partners ("Company Partners") (as defined below) to
terminate its relationship or otherwise cease doing business in whole or
in part with any member of the Company Group, or directly or
indirectly interfere with (or assist any Person to interfere with) any
relationship between any member of the Company Group and any
Company Partner. For purposes of this paragraph, the term "Company
Partners" means (a) all customers, customers, vendors, suppliers,
independent contract or other business partners of the Company Group as
of the Termination Date; and (b) any entity to which the Company submitted
a bid or responded to a request for a proposal prior to the Termination Date.

(Ex. 1, § 4.5 (emphasis added).)

34.    McCoy's Employment Agreement also contained a twenty-four (24) month

prohibition on soliciting or hiring any TCA employee or independent contractor who had worked

for TCA in the six (6) months before McCoy's termination:

**Section 4.4    Non-Solicitation of Employees.**

During the Term and for twenty-four (24) months following the Employee's
Termination Date, the Employee shall not directly or indirectly hire, contact,
induce or solicit (or assist any Person to contact, induce or solicit) for
employment any Company Employee. For the purpose of this paragraph,
the term "Company Employee" means an employee of, or independent
contractor engaged by, the Company at any time within the last six months
of the Employee's employment with the Company. The foregoing will not,
however, prohibit general solicitations that are not specifically directed to
any person who is or was an employee of the Company.

(Ex. 1, § 4.4.)

35.    McCoy acknowledged that any breach of the above provisions would cause TCA

irreparable harm.

**Section 4.9    Remedies.**

The Employee agrees that any breach of the terms of this Article IV would
result in irreparable injury and damage to the Company Group for which
the Company would have no adequate remedy at law; the Employee
therefore also agrees that in the event of said breach or any threat of breach,
the Company shall be entitled to an immediate injunction and restraining
order to prevent such breach and/or threatened breach and/or continued
breach by the Employee and/or any and all Persons acting for and/or with
the Employee, without having to prove damages, in addition to any other

remedies to which the Company may be entitled at law or in equity, including, without limitation, the obligation of the Employee to return any portion of the Severance paid by the Company to the Employee. The terms of this paragraph shall not prevent the Company from pursuing any other available remedies for any breach or threatened breach hereof, including, without limitation, the recovery of damages from the Employee. The Employee and the Company further agree that the provisions of the covenants contained in this Article IV are reasonable and necessary to protect the businesses of the Company Group because of the Employee's access to Confidential Information and his [sic] material participation in the operation of such businesses. In the event that the Employee willfully and materially breaches any of the covenants set forth in this Article IV, then in addition to any injunctive relief, the Employee will promptly return to the Company any portion of the Severance that the Company has paid to the Employee.

(Ex. 1, § 4.9.)

### B. McCoy's Position as Regional Director of the Company.

36.     McCoy played a critical role at TCA.  Specifically, McCoy oversaw nearly 80% of TCA's annual revenue.

37.     As Regional Director, McCoy was solely responsible for the entire day-to-day operations of thirteen dedicated locations.  McCoy oversaw TCA's employees and independent contractors at each location.  Seven TCA employees directly reported to McCoy.

38.     As part of her position, McCoy was instrumental in the hiring of TCA's independent contractors to service TCA's warehouses and customers.

39.     McCoy also played a vital role in customer engagement.  On a daily basis, McCoy interfaced with customers.

40.     In fact, for the past four years McCoy has had direct contact with TCA's two largest mattress customers.  These two customers produce over 90% of TCA's business and McCoy had direct and constant interaction with both customers on behalf of TCA and pursuant to her role as Regional Director.

41.    Specifically, McCoy participated in multiple weekly calls with the customers.  She also facilitated training and recruiting for TCA's last mile delivery teams who delivered for the customers.

42.    McCoy would not have had access to TCA's most important customers, much less any TCA customers, but for her executing the Employment Agreement and agreeing to be bound by the terms of the Employment Agreement.

**C.    McCoy Resigns And Immediately Violates her Employment Agreement.**

43.    Prior to her resignation, McCoy sent numerous emails from her TCA email (mmccoy@trucktca.com) to her personal email address (marymcc@gmail.com). McCoy had no reason to email documents or other materials to her personal email.  Upon information and belief, McCoy was sending TCA Confidential Information to herself.

44.    On or about December 14, 2025, McCoy deleted all sent mail associated with her TCA email (mmccoy@trucktca.com).  McCoy had no reason to delete all sent mail.

45.    On or about December 20, 2024, McCoy provided her two weeks' notice to TCA.

46.    On January 3, 2025, TCA sent McCoy an email reminding her of the duties and obligations she owed TCA under her Employment Agreement. A true and accurate copy of TCA's January 3, 2025 email is attached hereto as **Exhibit 2**.

47.    McCoy did not respond to TCA's reminder.

48.    On January 16, 2025, Victor Mraz, the President of TCA, attended dinner with a senior decision maker at one of TCA's largest customers who had previously worked with McCoy.

49.    At this dinner, Mr. Mraz was informed that McCoy was now employed by Diakon.

50.    In fact, the TCA client told Mr. Mraz that he had attended a last mile delivery call hosted by Diakon and McCoy.

51.     Diakon, via its website, expresses that it is "proud to provide dependable last-mile delivery services to the most respected bedding and mattress retailers in the country"[1] and "provides superior service solutions in last-mile furniture delivery to top regional and national retailers."[2]

52.     Accordingly, Diakon is actively engaged in competition with TCA because, by its own admission, Diakon arranges 'last mile' home delivery, warehousing and distribution services of non-conveyable goods.

53.     Consequently, Diakon is a "Restricted Enterprise" under the Employment Agreement. (*See* Ex. 1, § 4.3).

54.     Accordingly, McCoy's employment at Diakon is a direct violation of Section 4.3 of the Employment Agreement.  (*See* Ex. 1, § 4.3.)

55.     Upon information and belief, McCoy is violating the non-solicitation clause contained in her Employment Agreement by making and participating in calls with TCA's customers.  (*See* Ex. 1, § 4.5.)

56.     The only reason McCoy has for speaking with TCA's customers is to solicit business on behalf of Diakon.

57.     McCoy's solicitation and inducement of TCA's customers for Diakon and herself is a direct violation of her Employment Agreement. (*See* Ex. 1, § 4.5.)

58.     McCoy's solicitation and inducement of TCA's employees and independent contractors who had worked with TCA in the six months before McCoy's resignation is also a direct violation of her Employment Agreement.  (*See* Ex. 1, § 4.4.)

---

[1] https://www.diakonlogistics.com/bedding-mattresses.
[2] https://www.diakonlogistics.com/home-furnishings.

### D. McCoy Did Not Return TCA's Property or Confidential Information Upon Her Resignation.

59. TCA allows employees to utilize personal computers and uses password protected web-based systems for the internal use of its Confidential Information.

60. Upon information and belief, McCoy did not utilize TCA's web-based systems. Instead, McCoy worked from shared spreadsheets that contained TCA Confidential Information, including, but not limited to, Confidential Information about TCA's routes, rates, and pay scales, as well as detailed Confidential Information related to TCA's profits, revenue, and losses.

61. Upon McCoy's resignation, McCoy did not return any documents or spreadsheets to TCA.

62. Despite McCoy's Employment Agreement explicitly obligating her to return "all property, keys, notes, memoranda, writings, lists, files, reports, customer lists, correspondence, tapes, disks, cards, surveys, maps, logs, machines, technical data and any other tangible product or document which has been produced by, received by or otherwise submitted to the Employee," McCoy did not do so. (*See* Ex. 1, § 4.1.)

63. Despite requests from TCA to cease and desist, McCoy retained (and currently retains) TCA Confidential Information and continues her employment at one of TCA's direct competitors, Diakon.

64. McCoy's actions have caused, and will continue to cause, imminent irreparable harm to TCA. McCoy's presence as a Diakon employee, as noted by TCA's own customer, and confirmed by the President of Diakon, threatens to destroy the goodwill TCA has developed with one of its main customers.

65. McCoy's actions have irreparably harmed TCA, as McCoy now works for TCA's direct competitor in the last mile delivery arena.

66.     TCA has honored all its obligations under the Employee Agreement.

## COUNT ONE
## BREACH OF CONTRACT

67.     Plaintiff incorporates by reference each allegation above as if fully rewritten herein.

68.     On or about April 30, 2024, McCoy entered into the Employment Agreement with TCA.

69.     The Employment Agreement is a valid and enforceable contract.

70.     Under the Employment Agreement, McCoy agreed to certain restrictive covenants in which she agreed to (a) not perform the activities, duties, or responsibilities she performed at TCA at any "Restricted Enterprise" for a period of twelve months; (b) not retain, use, copy, transfer, and/or disclose TCA Confidential Information; (c) not, for a period of twenty-four months, solicit or hire any TCA employees or independent contractors who had been employed by TCA in the six months prior to McCoy's resignation; and (d) not interfere with, induce, or solicit any TCA customer, client, vendor, supplier, independent contractor, or business partner for twenty-four months after her termination of employment.  (Ex. 1. §§ 4.1, 4.3, 4.4, 4.5.)

71.     The restrictive covenants found in the Employment Agreement are reasonable in scope and duration and are necessary to protect TCA's legitimate business interests in TCA Confidential Information, goodwill, and longstanding customer relationships, especially in light of TCA's niche industry.

72.     TCA performed all of the duties and obligations owed to McCoy under the Employment Agreement.

73.     McCoy has breached, and continues to breach, the Employment Agreement by her employment at Diakon, a Restricted Enterprise that provides last mile delivery, her solicitation of

TCA's customers, employees, and independent contractors at Diakon, and by using and/or disclosing TCA's Confidential Information.  (See Ex. 1. §§ 4.3, 4.5.)

74.    Upon information and belief, McCoy, in her new role at Diakon, has solicited prior TCA employees and independent contractors who were employed by TCA in the six months prior to McCoy's resignation.

75.    TCA has incurred significant damages as a result of McCoy's breaches of the Employment Agreement.

76.    Moreover, McCoy's breaches are continuing.  TCA is therefore subject to continuing irreparable harm, economic injury, and damage to its goodwill and business reputation.

77.    TCA has no adequate remedy at law and, unless injunctive relief is granted, TCA will continue to be irreparably harmed by McCoy's breach of the Employment Agreement that is not fully compensable by money damages.

78.    TCA therefore requests that this Court grant injunctive relief against McCoy that prohibits McCoy from (a) working at any Restricted Enterprise competitor of TCA for a period of twelve months; (b) soliciting any TCA customers for a period of twenty-four months; (c) soliciting any TCA employees or independent contracts who were employed by TCA in the six months before McCoy's employment terminated for a period of twenty-four months; and (d) retaining any TCA Confidential Information.

79.    Finally, TCA is entitled to receive compensatory damages for McCoy's breaches of his contractual obligations.

## COUNT TWO
## VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT

80.    Plaintiff incorporates by reference each allegation above as if fully rewritten herein.

Docusign Envelope ID: 1C0B913D-6DEF-4805-8FCF-96C082107803

Case 2:25-cv-00762-JXN-CLW    Document 1    Filed 01/27/25    Page 16 of 25 PageID: 16


81.     TCA Confidential Information is not available to the general public and is closely guarded by TCA.  TCA keeps such information strictly confidential in order to maintain a competitive advantage over competitors.

82.     TCA Confidential Information is a trade secret under the Defend Trade Secrets Act, 18 U.S.C. § 1833, *et seq.* (the "DTSA") because the information is not generally known outside of TCA's business, TCA has taken reasonable measures to guard the secrecy of the information, the information is of great value to TCA and its competitors, TCA invested significant amounts of time, money and effort in developing the information, the information cannot easily be acquired or duplicated by others, and TCA continuously uses the information in its business.

83.     In particular, TCA's customer and client lists and customer and client contact information, among other information in McCoy's possession, is a trade secret under the DTSA. (*See* 18 U.S.C. § 1839(3).)

84.     TCA took reasonable efforts to maintain the secrecy of TCA's Confidential Information, by enacting and disseminating policies protecting TCA's Confidential Information, requiring the execution of the Employment Agreement to ensure that its employees protected TCA Confidential Information, requiring passwords to be used on its web-based systems, and utilizing software to protect and control TCA Confidential Information, among other ways.

85.     McCoy was contractually obligated under her Employment Agreement to return TCA Confidential Information to TCA immediately upon termination of her employment at TCA.

86.     Instead of complying with her duties and obligations, McCoy misappropriated TCA's Confidential Information.  At the time of McCoy's misappropriation, McCoy knew that she was using improper means to acquire and retain TCA Confidential Information in violation of the Employment Agreement.

16

87.     McCoy ignored, and continues to ignore, her contractual and legal obligations by continuing to possess TCA Confidential Information.

88.     Unless restrained, McCoy will continue to use, divulge, disclose, acquire, and/or otherwise misappropriate TCA Confidential Information.

89.     Actual or threatened misappropriation of trade secrets may be enjoined under the DTSA.

90.     It is axiomatic that if McCoy is actively using TCA Confidential Information in her new role, and intentionally violating the duties and obligations she owes TCA under the Employment Agreement, then McCoy has no intention of complying with the DTSA.

91.     Consequently, McCoy's actions constitute the actual and/or threatened misuse of TCA Confidential Information and trade secrets.

92.     Injunctive relief against McCoy is therefore appropriate.

93.     Naturally then, TCA requests an order enjoining McCoy from using, possessing or accessing TCA's Confidential Information and from disclosing TCA's Confidential Information to anyone not authorized to receive the Confidential Information, including but not limited to, Diakon.

94.     TCA further requests an order requiring McCoy to return any and all TCA Confidential Information to TCA.

95.     Finally, TCA's misappropriation of TCA's Confidential Information has been willful and malicious, and TCA has incurred significant damages as a result of McCoy's misappropriation.

96.     McCoy's actions have further damaged TCA's Confidential Information, goodwill, reputation, and legitimate business interests.

97.     TCA is therefore entitled to recover not only compensatory damages in an amount to be determined at trial (and over $75,0000), but also punitive damages and attorneys' fees resulting from McCoy's wrongful misappropriation of TCA Confidential Information.

### COUNT THREE
### VIOLATION OF THE NEW JERSEY TRADE SECRETS ACT

98.     Plaintiff incorporates by reference each allegation above as if fully rewritten herein.

99.     During the course of her relationship with TCA, McCoy was exposed to substantial amounts of TCA Confidential Information.

100.     This information is not available to the public and is closely guarded by TCA. TCA keeps this information strictly confidential in order to maintain a competitive advantage over its competitors, including Diakon.

101.     This information is considered a trade secret under the New Jersey Trade Secrets Act ("NJTSA"), N.J.S.A. 56:15-1, *et seq.,* because TCA derives independent economic value from the information not being generally known to the public, the information is not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

102.     The economic value of TCA Confidential Information that McCoy had access to and misappropriated is in excess of $1,000,000.

103.     McCoy misappropriated TCA's Confidential Information and trade secrets beginning in January 2025.

104.     Based upon information and belief, McCoy also engaged in other acts of misappropriation that will be revealed through discovery.

105.     Injunctive relief is therefore appropriate, and TCA requests that this Court enter an order enjoining McCoy from using, possessing, or accessing any TCA Confidential Information

and from disclosing TCA Confidential Information to anyone not authorized to receive the Confidential Information.

106.    TCA also requests that this Court enter an order requiring McCoy to return any and all TCA Confidential Information in her possession, custody or control.

107.    TCA has incurred significant damages as a result of McCoy's misappropriation of TCA Confidential Information.

108.    McCoy's actions have also damaged TCA's goodwill, reputation, and legitimate business interests.  TCA's damages, described above, are well in excess of $75,000.00, and TCA seeks monetary and economic damages provided by N.J.S.A. 56:15-1, *et seq*.

109.    Finally, McCoy's misappropriation of TCA's Confidential Information has been willful and malicious.  As a result, TCA is entitled to recover its attorneys' fees from McCoy.

**COUNT FOUR**
**UNFAIR COMPETITION**

110.    Plaintiff incorporates by reference each allegation above as if fully rewritten herein.

111.    McCoy's use of TCA Confidential Information, including but not limited to customer lists, logistics information, and pay scales and rates, is conduct which creates a likelihood of confusion or misunderstanding for TCA's customers.

112.    McCoy's use of TCA Confidential Information, including but not limited to customer lists, logistics information, and pay scales and rates, further causes confusion or misunderstanding as to affiliation, connection, or association of McCoy, as a prior TCA employee, with Diakon.

113.    McCoy intended for TCA's customers and potential customers to rely on McCoy's deception.

114.    McCoy's conduct as alleged herein constitutes unfair competition under New Jersey common law.

115.    McCoy acted in willful, deliberate, and intentional disregard of TCA's rights.

116.    As a direct and proximate result of McCoy's unfair competition, TCA has suffered irreparable harm, for which it has no adequate remedy at law, and will continue to suffer such irreparable injury unless and until McCoy's unfair competition is enjoined by this Court.

117.    Accordingly, TCA requests that this Court enter an order enjoining McCoy from engaging in any acts of unfair competition with TCA.

118.     TCA is further entitled to recover damages in an amount to be determined at trial, resulting from McCoy's willful unfair competition in violation of TCA's rights.

**WHEREFORE**, Plaintiff TCA Logistics, LLC, respectfully requests that this Court:

1.    Enter an injunction enjoining and restraining Mary E. McCoy from:

    a.    Working for or with any TCA competitor or Restricted Enterprise for a period of twelve months;

    b.    Soliciting any TCA customer, client, vendor, supplier, or other business partner for a period of twenty-four months;

    c.    Soliciting any TCA employee or independent contractor who was employed at TCA in the six months before McCoy's employment terminated for a period of twenty-four months;

    d.    Using, possessing, or accessing any TCA Confidential Information; and

    e.    Disclosing and/or transferring TCA Confidential Information to anyone not authorized to receive the information.

2.      Enter an order enjoining McCoy from engaging in any acts of unfair competition with TCA;

3.      Enter an order requiring McCoy to return all TCA Confidential Information in her possession, custody, or control to TCA;

4.      Enter judgment against McCoy for compensatory damages in an amount to be determined at trial;

5.      Enter judgement against McCoy for punitive damages in an amount to be determined at trial;

6.      Award TCA the costs and expenses, including reasonable attorneys' fees, TCA incurs as a result of McCoy's violations of the New Jersey Trade Secrets Act and Defend Trade Secrets Act; and

7.      Award TCA such other relief as the Court may deem just and proper.

Dated: January 27, 2025

Respectfully submitted,

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

*/s/ Noelle B. Torrice*
Noelle B. Torrice
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
ntorrice@beneschlaw.com

J. Scott Humphrey (PHV forthcoming)
71 South Wacker Drive, Suite 1600
Chicago, IL 60606-4637
Telephone: (312) 624-6420
Facsimile: (312) 767-9192
shumphrey@beneschlaw.com

Jaquan Williams (PHV forthcoming)
Sarah J. Schneider (PHV forthcoming)
127 Public Square, Suite 4900
Cleveland, OH 44114
Phone: (216) 363-4500
Fax:    (216) 363-4588
jwilliams@beneschlaw.com
sschneider@beneschlaw.com

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## <u>VERIFICATION</u>

I, Victor Mraz, am the President of TCA Logistics LLC, and I hereby verify that the facts

set forth in the foregoing Verified Complaint and its exhibits are true and correct to the best of my

knowledge, information, and belief.

Signed by:

*Victor Mraz*

E933C4E7A1D345B

Victor Mraz

Dated this _____24th_____ day of _____January_____, 2025

**docusign**

## Certificate Of Completion

Envelope Id: 1C0B913D-6DEF-4805-8FCF-96C082107803          Status: Completed
Subject: Complete with Docusign: 2025.01.24 Complaint - TCA McCoy.pdf
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 24 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Sarah Schneider |
| AutoNav: Enabled | | 127 Public Square |
| EnvelopeId Stamping: Enabled | | Suite 4900 |
| Time Zone: (UTC-05:00) Indiana (East) | | Cleveland, OH  44114 |
| | | sschneider@beneschlaw.com |
| | | IP Address: 134.238.180.52 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Sarah Schneider | Location: DocuSign |
| 1/24/2025 5:35:57 PM | sschneider@beneschlaw.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Victor Mraz | *Signed by:* | Sent: 1/24/2025 5:46:12 PM |
| vmraz@diverselogistics.com | Victor Mraz | Viewed: 1/24/2025 6:03:59 PM |
| COO | F933C4F7A1D345B... | Signed: 1/24/2025 6:04:10 PM |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 47.195.50.22 | |

**Electronic Record and Signature Disclosure:**
  Accepted: 1/24/2025 6:03:59 PM
  ID: fe87e0f0-835f-4153-9c67-f8a104450a55

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 1/24/2025 5:46:12 PM |
| Certified Delivered | Security Checked | 1/24/2025 6:03:59 PM |
| Signing Complete | Security Checked | 1/24/2025 6:04:10 PM |
| Completed | Security Checked | 1/24/2025 6:04:10 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure